Below is an Opinion of the Court.

_____
ELIZABETH PERRIS
U.S. Bankruptcy Judge

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: ) | |
| ) | Bankruptcy Case No. |
| JEREMY PAUL KILLIAN and ) | 07-33641-elp7 |
| MIKKEL JENE LESSER, ) | |
| ) | |
| Debtors. ) | |
| ) | |
| UNITED STATES TRUSTEE, ) | Adversary No. 07-3315 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | |
| JEREMY PAUL KILLIAN and ) | |
| MIKKEL JENE LESSER, ) | |
| ) | |
| Defendants. ) | |

The United States Trustee (UST) filed a complaint to deny chapter 7[1] debtors Jeremy Killian and Mikkel Lesser (debtors) a discharge and a motion to dismiss their case for abuse. The facts underlying both the adversary complaint and the motion are largely the same, so were

---

[1] All chapter and section references in this opinion are to the Bankruptcy Code, 11 U.S.C. § 101 et seq.

Page 1 - MEMORANDUM OPINION

consolidated for trial, which occurred on October 9, 10, 14, 15, and 22, 2008.  For the reasons set out below, I find that debtors knowingly and fraudulently made false oaths in or in connection with the case, and therefore will deny them a discharge pursuant to § 727(a)(4)(A).  I will not decide the motion to dismiss, because the UST indicated during closing argument that he did not want to pursue that motion if the court denied debtors a discharge.

FACTS

The parties presented an extensive stipulation of facts, as well as four days of testimony and numerous exhibits.  I find the following relevant facts.

Debtor Jeremy Killian is 25 years old.  His wife, Mikkel Lesser, is 24 years old.  They met in high school.  Jeremy moved in with Mikkel and her mother Myrna Lesser in 1999 when debtors were teenagers.  Both dropped out of high school to help support the family after Mikkel's father died.  Mikkel received her GED; Jeremy received his high school diploma after attending night school.

Both debtors ended up working in the banking business.  Mikkel worked at US Bank in the mailroom for a year and a half, then worked in the loan department for another year.  She then left the bank and started beauty school, which she did not finish.  After Jeremy started his own business, Mikkel provided unpaid clerical help for the business.

Jeremy began working at US Bank in 2001 as a note processor.  He worked in various capacities in the bank including as a teller, in collections, and as a universal banker.  In 2003 he began working as a broker/loan officer with Diamond Financial.  Over the course of the next

Page 2 - MEMORANDUM OPINION

two years, he worked in two other companies as a loan broker.

In March 2005, Jeremy started brokering loan transactions on his own. He developed a foreclosure rescue program under which he would find homeowners who were about to lose their homes to foreclosure. He would also find an investor who was willing to take out a loan to purchase the property from the homeowner and lease the home back to the homeowner with a two-year option to repurchase the home. The price the investor would pay for the property, using funds obtained through a mortgage loan Jeremy would arrange, would be high enough to pay off any existing encumbrances plus substantial fees. The homeowner would pay rent, the amount of which was determined by the amount the investor was paying on the new mortgage. In exchange for Jeremy's finding the investor and brokering both the loan and the deal, Jeremy (and later the partnership he formed) would receive a fee of between $30,000 and $50,000, depending on the transaction. The investor would also receive a fee for taking the risk of purchasing the property.

Between the time Jeremy began brokering on his own and the end of 2006, less than two years, he brokered more than 60 foreclosure rescue deals. He found numerous investors, and involved his wife's brother and sister-in-law in the business. For approximately 25 of these deals, Jeremy personally entered into partnership agreements with the investors in which he and the investors agreed to share the gain or loss on the property when it was eventually sold. In August 2005, he and Michael and Tammie Delaney, who were previous investors, formed a partnership called DK Investments to continue the foreclosure rescue business.

Over the course of the time Jeremy was brokering the foreclosure

Page 3 - MEMORANDUM OPINION

deals, Jeremy received total payments from the close of the sale of foreclosure properties of $273,964 in 2005, $474,950 in 2006, and $55,945 between January and July 2007. Total deposits into debtors' joint bank account during that time totaled $507,340 for 2005, $648,163 for 2006, and $319,565 from January 1, 2007 until debtors filed their chapter 7 bankruptcy petition on September 11, 2007. During this same period, debtors spent $112,838 on jewelry using funds withdrawn from the joint account, and made apparel purchases of $127,712 (including the purchase of luxury apparel and handbags), household goods purchases of $71,373, and spent $66,207 on travel.

Debtors filed a chapter 7 petition on September 11, 2007. They consulted Neil Jorgenson, an attorney, who with his assistant Joe Dunne prepared debtors' bankruptcy petition, schedules and statement of financial affairs (SOFA).

The schedules and SOFA contained numerous significant errors and omitted a breathtaking amount of significant financial information. For example, the original SOFA indicates that debtors had zero income for the two years preceding the petition. Debtors did not list any of the partnerships for the various individual properties, although they did list DK Investments. Debtors stated that they owned no jewelry. They indicated on the SOFA that they had not made any transfers of property in the previous two years.

At the first meeting of creditors on October 18, 2007, the trustee advised debtors that their SOFA was "woefully inadequate," and that they needed to read the SOFA and bankruptcy schedules. The trustee continued the meeting until October 31, 2007.

At the October 31, 2007 meeting, debtors testified under oath that they had read the petition and schedules before they signed them and that they had recently read and reviewed the schedules and petition. They further testified that the information contained in the petition, schedules, SOFA, and related documents was true and correct and that they had listed all of their assets and creditors as of the filing date. However, their testimony at that October 31, 2007 meeting indicated that there were numerous transfers and significant property that had not been listed in the original bankruptcy filing.

The trustee again continued the meeting of creditors, this time to November 28, 2007. By the time of the November 28, 2007 meeting, debtors had not filed any amended schedules or SOFA, despite having been told by the trustee that their original schedules and SOFA were woefully inadequate.

Debtors filed amended schedules B and C and an amended SOFA on December 7, 2007, shortly before the deadline for filing objections to discharge. Amended schedule B disclosed for the first time five items of jewelry with a total value of $1,250, some counterclaims against creditors who had previously sued debtors, and 10 dogs. The amended SOFA disclosed income for Jeremy Killian of $43,149 for 2007, -$18,968 for 2006, and $89,338 for 2005. It listed no income for Mikkel Lesser. The amended SOFA also contained more complete information about pending lawsuits. It continued to list as "none" transfers of property within the previous two years, and still did not disclose Jeremy's 25 partnerships relating to individual properties.

Debtors testified at trial that their failure to disclose income,

assets, partnerships, and transfers in their bankruptcy documents was the fault of their attorney and his legal assistant. They testified that they gave either Jorgenson or Dunne all of the information that was requested, and that they signed the original petition, schedules and SOFA and the amended schedules and SOFA without seeing the documents. Jeremy testified, and Jorgenson confirmed, that Jeremy gave Jorgenson a spreadsheet showing the names and properties involved in all of the 61 foreclosure property transactions and that Jorgenson knew about the 25 partnerships relating to some of those properties. Debtors further testified that Jorgenson told them to testify that they had reviewed the schedules when asked about it by the trustee.

DISCUSSION

1. <u>False oaths</u>

The UST seeks to deny debtors' discharge based on false oaths in their original and amended bankruptcy documents as well as false statements made under oath at the § 341(a) meeting of creditors.

To deny a debtor a discharge under § 727(a)(4)(A), the plaintiff must show that "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." <u>In re Roberts</u>, 331 B.R. 876, 882 (9th Cir. BAP 2005). False oaths include false statements or omissions in the debtor's schedules or SOFA. <u>In re Khalil</u>, 379 B.R. 163, 172 (9th Cir. BAP 2007); <u>In re Beaubouef</u>, 966 F.2d 174 (5th Cir. 1992); <u>In re Wills</u>, 243 B.R. 58, 62 (9th Cir. BAP 1999).

Intent must be actual, not constructive. <u>In re Jones</u>, 175 B.R. 994, 1002 (Bankr. E.D. Ark. 1994). Fraudulent intent may be inferred from the

Page 6 - MEMORANDUM OPINION

actions of the debtor, <u>In re Devers</u>, 759 F.2d 751, 753-54 (9th Cir. 1985), or from the surrounding circumstances. <u>See In re Woodfield</u>, 978 F.2d 516, 518-19 (9th Cir. 1992). Reckless indifference to the truth is not sufficient by itself to establish fraudulent intent, but a court may find intent from reckless conduct, particularly "where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth." <u>Khalil</u>, 379 B.R. at 173 (quoting <u>Wills</u>, 243 B.R. at 64). "For instance, multiple omissions of material assets or information may well support an *inference of fraud* if the nature of the assets or transactions suggests that the debtor was aware of them at the time of preparing the schedules and that there was something about the assets or transactions which, because of their size or nature, a debtor might want to conceal." <u>Id.</u> at 175 (quoting with approval <u>In re Coombs</u>, 193 B.R. 557, 565-66 (Bankr. S.D. Cal. 1996))(emphasis in original). Intent may be established by "[t]he sheer number of material inaccuracies contained in schedules" that a debtor has reviewed before filing. <u>In re Hansen</u>, 368 B.R. 868, 878 (9th Cir. BAP 2007).

A statement is material if it relates to "the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." <u>Wills</u>, 243 B.R. at 62; <u>In re Chalik</u>, 748 F.2d 616, 618 (11th Cir. 1984). "A false statement or omission may be material even if it does not cause direct financial prejudice to creditors." <u>Wills</u>, 243 B.R. at 63. "[A] discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition." <u>Id.</u>

Page 7 - MEMORANDUM OPINION

(quoting from 6 Lawrence P. King, Collier on Bankruptcy ¶ 727.04[1][b] (15th ed. Rev. 1998)).

Debtors' defense is primarily that they gave their counsel all of the information necessary to complete the bankruptcy documents, and relied on him to include the necessary information in the documents. "Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts." In re Adeeb, 787 F.2d 1339, 1343 (9th Cir. 1986). Advice of counsel is no defense, however, when reliance on the advice is not in good faith, id., or when it should be evident that the information should be included. In re Mascolo, 505 F.2d 274, 277 (1st Cir. 1974); In re Leija, 270 B.R. 497, 503 (Bankr. E.D. Cal. 2001). The defense applies only when the debtors have provided all relevant information to the attorney, and even "attorney error does not absolve a debtor, who signs the petition and schedules under penalty of perjury, from the duty to ensure the information is accurate and complete to the best of his knowledge." In re Downey, 242 B.R. 5, 15 (Bankr. D. Ida. 1999). "A debtor cannot, merely by playing ostrich and burying his head in the sand, disclaim all responsibility for statements which he has made under oath." In re Tully, 818 F.2d 106, 111 (1st Cir. 1987).

The evidence in this case shows that debtors made numerous false statements and omissions. Although the following specific findings of falsehood are by no means comprehensive, they are illustrative of the sweep of pervasive deficiencies in the documents, and are sufficient on their own to support a finding of false oaths:

////

Page 8 - MEMORANDUM OPINION

A. <u>Original schedules and SOFA</u>

The evidence shows that debtors made the following false statements, including omissions, in their original bankruptcy petition, schedules, and SOFA:

    i. Debtors signed the petition, schedules, and SOFA under penalty of perjury, declaring that the information included in them was true and correct. In fact, debtors had not reviewed the petition, schedules, or SOFA, and the documents were neither true nor correct.

    ii. The original SOFA failed to disclose any income for 2005, 2006, and 2007, when in fact debtors had hundreds of thousands of dollars flowing through their joint bank account during that period, at least $100,000 of which was income from the foreclosure deals. Debtors did not disclose their receipt of rental income from Jason and Michelle Lesser or Melanie Noel, which they admitted they received within two years before bankruptcy.

    iii. Debtors' Schedule B showed that they did not own any jewelry. However, at the time the petition was filed, they owned at least a pair of 14 karat gold cluster diamond earrings purchased in 2005 for $1,295, a diamond men's TAG watch purchased in 2006 for $4,095, a silver and 18 karat gold diamond bracelet purchased in 2006 for $1,270, a gold bracelet purchased in 2006 for $315, several gold bracelets purchased in 2007 for $447, a pair of diamond solitaire earrings purchased in 2007 for $954, a silver "lava berry" ring purchased in 2007 for $1,350, and three gold bracelets purchased in 2007 for $657.

    iv. Debtors' SOFA did not disclose Jeremy's partnership interest in the 25 partnerships relating to individual foreclosure

property deals.

   v. Debtors did not disclose any transfers of property occurring within the two years before bankruptcy, instead stating "none" to question 10 on the SOFA. In fact, debtors transferred an astounding amount of property within the two years preceding bankruptcy. Those transfers include, but are not limited to:

   a. Real property. Jeremy transferred the following real property within two years before the petition: the Mohawk property,[2] transferred in June 2006; the 63rd Avenue property, transferred in July 2006; the Oneonta Drive property, transferred in February 2007; the 15th Avenue property, transferred in September 2006; and the Apple Court property, transferred in July 2006.

   b. Jewelry. This includes the transfer of a 2.5 carat loose diamond (traded in November 2005 toward the purchase of a 4.6 carat Platinum White Diamond Ring), a 4.6 carat Platinum White Diamond Ring (purchased for $56,100 in November 2005 and traded for a 5.02 carat oval cut Gold White Diamond Ring in October 2006), a 3.05 carat Yellow Diamond Ring (purchased in October 2006 for $44,000 and sold in May 2007 for $18,000), an 18 karat Rolex (purchased in 2006 for $16,500 and sold in June 2007 for $7,000), and the 5.02 carat oval cut Gold White Diamond Ring (given to Brent Near in June 2007 as collateral for a loan).

   c. Household goods. Debtors purchased nearly $200,000 of apparel and household goods in the two years before bankruptcy. Their

---

[2] The shorthand descriptions of the property contained in this opinion are those used by the parties during the trial. Complete descriptions of the specific properties are contained in the relevant exhibits.

Page 10 - MEMORANDUM OPINION

only explanation for the absence of those items on their chapter 7 petition was that they had sold the items at a garage sale that they held over two week-ends in the spring of 2007 and for which they received between $4,000 and $5,000.

        d.    Mercedes. In May 2007, debtors sold a 2004 Mercedes for $64,000, which was less than they owed on the vehicle.

        e.    Creditors. Debtors failed to list as creditors people to whom debtors owed money on the petition date, in particular Mikkel's mother Myrna Lesser, Hiep Pham, Dawn Meaney, and Jeremy's father John Killian. Debtors listed Brent Near as an unsecured creditor when in fact he held security for the loan.

    B.    <u>Meeting of creditors</u>

Debtors' meeting of creditors began in mid-October 2007, but was continued until October 31, 2007 and then again to November 28, 2007. At the October 31, 2007 meeting, debtors testified under oath that they had (1) read the bankruptcy documents, including the schedules and SOFA, and that the information contained in those documents was true and correct, and (2) that they had not transferred any property within two years before bankruptcy. Both of those statements under oath were false.

    C.    <u>Amended schedules and SOFA</u>

At the meeting of creditors, the trustee warned debtors that their schedules and SOFA were woefully inadequate. Despite the passage of almost two months before debtors amended those documents, they failed to disclose in the amended schedules and SOFA either Jeremy's partnership interest in the 25 partnerships or any of the transfers of property discussed above. The evidence shows that debtors were aware of the

Page 11 - MEMORANDUM OPINION

transfers and must have known that disclosure of transfers of property was required: before they amended the schedules and SOFA, they had been asked specifically at the October 31 meeting of creditors whether they had transferred anything of value in the last four years, and they had testified at the continued meetings of creditors about some of the transfers, including the transfer of the Mercedes and some of the jewelry.

All of these false statements and omissions, either contained in the bankruptcy documents signed under penalty of perjury or testified to at the meeting of creditors, are false oaths in connection with the case. There can be no question that the oaths related to material facts, as they were related to debtors' assets and business affairs, and adversely affected the ability to fully investigate debtors' pre-bankruptcy dealings and financial condition.

The only remaining question is whether the false oaths were knowingly and fraudulently made. Given the extent of the false statements and omissions and debtors' willingness to lie at their meeting of creditors, I conclude that both debtors knowingly and fraudulently made false oaths.

Debtors testified that they did not read or review the bankruptcy petition, schedules, or SOFA before they signed the documents. Nonetheless, they signed those documents under penalty of perjury, representing that the information contained in them was true and correct. That was a lie. Debtors testified that they did not review the documents before they signed the signature pages, because when they went to their attorney's office to sign the documents, they were given only the

Page 12 - MEMORANDUM OPINION

signature pages and not the bankruptcy documents themselves. Dunne testified, however, that the original bankruptcy documents were physically in the room with debtors when they came in to sign the documents, and that debtors had the opportunity to review them before signing. I do not believe debtors' testimony that counsel failed to give them access to the documents before having them sign under penalty of perjury.

The testimony with regard to the amended schedules and SOFA strongly supports a finding that the false oaths were knowingly and fraudulently made. Debtors had been warned by the trustee at the meeting of creditors that the schedules and SOFA were woefully inadequate. Counsel sent a draft of the amended documents to debtors via email, so debtors had ample opportunity to review those documents at their leisure and assure that they were complete. Jorgenson advised debtors to review the documents carefully. Jeremy testified that he called Dunne after he received the draft to tell him about inaccuracies. But Jeremy could not say what those inaccuracies were and he nonetheless signed the amended schedules and SOFA, which continued to contain numerous significant inaccuracies and omissions. Debtors' continued failure to include anywhere near complete information in the amended documents supports a finding that their oaths attesting to the accuracy of the documents were willfully and knowingly false.

Jeremy provided excuses in his testimony for almost all of the problems with the bankruptcy documents. He testified that he told either Jorgenson or Dunne about the partnerships and some of the jewelry, but that he overlooked the transfer of the Mercedes. He testified that he

Page 13 - MEMORANDUM OPINION

relied on counsel to complete the documents correctly with the information he and his wife had provided.

A simple review of both the original and the amended documents would have revealed their woeful inadequacy. No transfers of property were listed, nor were any of the partnerships. The documents indicated that debtors had no jewelry, when debtors knew they had a number of pieces of jewelry in their possession. They knew they had a garage sale and that they had disposed of household goods, clothing and designer handbags that had been purchased in the past two years for nearly $200,000. Yet none of that was disclosed. They knew that they owed debts to Mikkel's mother and Jeremy's father, but those creditors were not listed. They knew that they had income, but the original SOFA listed their income as zero.

Although debtors may have told their counsel about some of the financial matters that were omitted from the bankruptcy documents, their abdication to counsel of their responsibility to include correct and complete information on the forms was unreasonable and shows a shocking level of disregard for the obligation to assure accuracy in the information provided in a bankruptcy case. Although a debtor who acts in reliance on the advice of counsel can lack the intent required to deny a discharge, reliance on advice of counsel is not a defense when it should be evident that the information should be included. Had debtors intended to disclose their entire financial situation on the bankruptcy documents, they would have reviewed those documents and asked questions about why numerous items were not included, including their income. The evidence does not support a finding that debtors questioned counsel about the numerous omissions and received assurances that those omissions were

Page 14 - MEMORANDUM OPINION

acceptable. Instead, the evidence shows that debtors failed to disclose to their counsel their complete financial affairs, and then failed to assure that the bankruptcy documents accurately reflected even the information that they had provided to counsel.

Jeremy testified that Dunne assured him that changes could be made later if there were inaccuracies in the original documents, and that Jeremy should not worry about whether the information included in the filed documents was true. I do not believe that testimony. But even if Dunne did make such statements, debtors had a responsibility to make sure the information was correct and complete before signing the documents under penalty of perjury. Furthermore, many of the inaccuracies continued in the amended documents.

I also find that debtors' testimony under oath at the meeting of creditors that they had read the schedules and SOFA and that they were true and correct was a knowing, fraudulent lie. I do not believe their testimony that their lawyer told them to lie under oath. They knew when they testified that they were under oath and that the testimony they were giving was false. They also had to know that it would mislead the trustee and the creditors who were in attendance. Even if it is true that Jorgenson told debtors to testify that they had read the schedules and SOFA before they signed them, there is no evidence that Jorgenson knew that debtors had not done that. It was debtors, not Jorgenson, who were under oath at the meeting of creditors. It was debtors' obligation to tell the truth, regardless of what their counsel may have said. Even "attorney error does not absolve a debtor, who signs a petition and schedules under penalty of perjury, from the duty to ensure the

Page 15 - MEMORANDUM OPINION

information is accurate and complete to the best of his knowledge." <u>In re Downey</u>, 242 B.R. 5, 15 (Bankr. D. Ida. 1999).

Although Mikkel did not have the level of involvement in the preparation and discussion of the bankruptcy documents as did Jeremy, I find that her signatures under penalty of perjury and her testimony under oath at the meeting of creditors were knowing and fraudulent oaths. If Mikkel had not reviewed the documents before she signed them, then she knew that her signature under penalty of perjury was false. If she had reviewed the documents before she signed them, she would have seen that they were false at least in indicating that debtors did not have any jewelry, in failing to list Mikkel's mother as a creditor, in failing disclose any income, and in failing to disclose the transfer of much of their personal property, which had occurred only months before. She also testified under oath that she had reviewed the documents and that they were true, and that debtors had not made any transfers within the two years before bankruptcy. As she testified at trial, Mikkel knew she had not reviewed the schedules before she signed them, and she knew about transfers of jewelry and other personal property within months of the filing. I do not believe that Mikkel was an innocent bystander, but instead find that she knew she was giving false, fraudulent testimony.

In this case, debtors were more than reckless about filing their schedules, the SOFA, the amended schedules, and the amended SOFA that contained falsehoods and omissions, and about giving false testimony at the meeting of creditors. This is evidence of more than a cavalier attitude toward truth-telling. These debtors, although not formally educated beyond a high school level, had worked in the banking industry

Page 16 - MEMORANDUM OPINION

and mortgage loan industry for a number of years. They understood their financial situation, but failed to make any effort at all to assure that the depth and scope of their financial situation was disclosed in their bankruptcy documents. They utterly disregarded their obligation to tell the truth, which is fundamental to the administration of the bankruptcy system. These debtors were not merely reckless; they had no concern for assuring that full and complete information was provided and were willing to testify falsely under oath that they had reviewed their bankruptcy documents and that the information provided was true and correct.

Debtors' failure to be forthcoming in their financial affairs has required the trustee, the UST, and creditors to expend substantial efforts to seek out accurate information about debtors' financial affairs. Such effort would not have been required, or would have been reduced, if debtors had not completely disregarded their obligation to provide complete, accurate information. Debtors' behavior is the type that results in denial of discharge under § 727(a)(4)(A).

2. <u>§ 727(a)(3), 727(a)(5), 727(a)(2)(B)</u>

Because I have concluded that debtors should be denied a discharge based on the false oaths, I will not consider or rule on the alternative bases for denying a discharge.

3. <u>Motion to dismiss</u>

I will not consider or rule on the UST's alternative motion to dismiss for abuse, based on the UST's indication that he does not want to pursue dismissal if discharge is denied.

## CONCLUSION

Debtors filed their bankruptcy documents, signed under penalty of

perjury, which contained numerous errors and omissions, either knowing that they were incorrect or without reviewing them to assure their accuracy. They testified falsely at their October 31, 2007 meeting of creditors. After they were warned of the need to amend their documents to assure accuracy, they filed amended documents, signed under penalty of perjury, that still contained significant errors and omissions. I conclude that debtors made knowing, fraudulent false oaths in and in connection with this bankruptcy case, and that they should be denied a discharge under § 727(a)(4)(A).

Ms. McClurg should submit the judgment within ten (10) days after entry of this Memorandum Opinion.

###

cc: Carla McClurg
   Paul Bocci